# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **DONALD CONWELL,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 12 C 10062** |
| **v.** | ) | |
| | ) | **Chief Judge Rubén Castillo** |
| **COMMANDER J.K. JOHNSEN, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Donald Conwell ("Plaintiff") brings this action under 42 U.S.C. § 1983 against Cook County, Cook County Sheriff Thomas Dart ("Sheriff Dart"), 27 individual employees of Cook County Jail ("Defendant Officers"), and 4 John Does for violations of his First, Eighth, and Fourteenth Amendment rights. (R. 88, Third Am. Compl.) Sheriff Dart and 17 of the Defendant Officers now move for partial summary judgment. (R. 114, Mot.; R. 117, Dart Mot.) For the reasons set forth below, Sheriff Dart's motion for summary judgment is granted and the Defendant Officers' motion for summary judgment is granted in part and denied in part.

## FACTS

Plaintiff claims that the events alleged in his amended complaint demonstrate a campaign of harassment by staff at the Cook County Jail between 2011 and 2013. (Third Am. Compl. ¶¶ 39-45.) Plaintiff alleges that in 2007 he was beaten by guards in the Cook County Jail and, as a result, he has limited mobility and uses a wheelchair. (*Id.* ¶ 39.) Plaintiff filed a lawsuit against a number of jail officers; however, it was dismissed for lack of prosecution. (*Id.* ¶ 40; R. 1-3, Compl., *Conwell v. Cook Cty.*, 09-cv-02359 (N.D. Ill., filed Apr. 17, 2009); *see also id.* at R. 86, Dismissal for Want of Prosecution.) Plaintiff found himself back in jail in 2011 and has since

filed "numerous . . . grievances against various officers at the Cook County Jail." (Third Am.

Compl. ¶¶ 40-41.) Because of the prior lawsuit and these grievances, Plaintiff claims that many

officers "feel and express animus" toward Plaintiff, that officers and detainees have entered into

"an agreement to violate Plaintiff['s] . . . civil rights," and that the parties "have participated in

overt acts in furtherance of that agreement." (*Id.* ¶¶ 42-44.) During the relevant time period,

Plaintiff was a pretrial detainee assigned to the Cermak Hospital unit within the Cook County

Jail. (*Id.* ¶ 1.) The facts are undisputed unless otherwise stated.

## I.    Altercations with Inmates

### A.  Inmate Brooks

On February 5, 2012, Plaintiff claims that Defendant Nathan Bowens announced in front

of other inmates within the general inmate population that Plaintiff was a "snitch." (R. 122, Pl.'s

Suppl. Facts ¶ 3.) As a result, and despite the fact that Plaintiff claims that he was allegedly

already in protective custody, Plaintiff asked Bowens to be placed in protective custody because

he feared for his safety. (Conwell Dep. at 38-39.) After being called a snitch, Plaintiff testified

that other inmates verbally assaulted him. (*Id.* at 42.) The next day, Plaintiff entered inmate

Richard Brooks's cell to speak with his cellmate. (*Id.* at 44.) As he was leaving the cell, he was

attacked by Brooks. (*Id.*) Plaintiff testified that the attack was unprovoked, he had no prior

problems with Brooks, and that he "was shocked" at what happened. (*Id.* at 43-45.) A

disciplinary report from the date of the incident states that Officer Smith "witnessed detainee

Conwell . . . fall on the floor in the doorway of room 3221," and that detainee Brooks was

"following [from] behind him shouting 'You hit me in the balls' and 'get out of my room.' " (R.

122-7, Ex. 1 to Bowens Dep., Disciplinary Report.) Plaintiff alleges that Lieutenant Bowens and

Officer Smith (first name unknown), and a John Doe Officer failed to protect him from inmate Brooks on February 6, 2012. (Third Am. Compl. ¶¶ 46-53.)

## B. Inmate Dawson

In August 2012, Plaintiff filed at least two emergency grievances relating to inmate Kevin Dawson. (R. 122-12, Ex. L to Resp., Emergency Grievances.) One of the grievances indicated that Officer Jose Tiscareno was "trying to" get Dawson to attack Plaintiff and that Dawson had "placed a bunch of threatening letters on the window to let me view." (*Id.* at 1.) In another grievance, Plaintiff claimed that Officer Tiscareno gave Dawson "a metal object with a sharp tip (knife)" and that Dawson was hiding this knife in "his wheel-chair [or] mattress." (*Id.* at 2.) Plaintiff also signed an "Office of Professional Review Complaint Register" on September 19, 2012, reiterating these allegations. (*Id.* at 4-5.) On October 16, 2012, Commander J.K. Johnsen issued a Cook County Department of Corrections memorandum. (R. 122-2, Ex. B to Resp. to Mot., Keep Separate Order.) The subject of the memorandum was "Detainees Allowed out of Their Rooms" and it was addressed to "3 South Security Staff." (*Id.* at 1.) The document states:

> **At no time will detainee Conwell, Donald #2012-0607038 be allowed out with detainee Gibbs, Henry #2008-0073343 or detainee Dawson, Kevin #2010-00322194.**

(*Id.*)

On October 25, 2012, Defendant Officer Rommel Romero escorted Plaintiff to a staging area at the Cook County Jail because Plaintiff had a court appearance scheduled on that day. (R. 122, Pl.'s Resp. to Facts ¶ 15.) Before he left his cell, Plaintiff told Officer Romero of the Keep Separate Order between Dawson and himself. (Conwell Dep. at 48-49.) Plaintiff also testified that right before he entered the staging area, he saw Dawson inside the area and told Defendant

Officer Jimmy Chapman that he feared for his safety, Dawson may have weapons on him, and that the two inmates were to be kept apart. (*Id.* at 58-59.) Likewise, Plaintiff testified that he also told Defendant Officer John Malloy on that day that he and Dawson were "to be kept separate." (*Id.* at 60.)

Officer Romero testified that he left Plaintiff in the custody of the officers that were on duty in the staging area. (Pl.'s Resp. to Facts ¶ 16.) He also stated that when he left the staging area, he did not see any other inmates present. (*Id.* ¶¶ 17-18.) However, Plaintiff's testimony suggests that Dawson was in the staging area before he entered the room. (Conwell Dep. at 59.) While it is unclear from the record when Dawson entered the staging area and who escorted him there, the two inmates were in the same area at the same time, a fight ensued, and Plaintiff testified that Dawson hit him and stabbed him with a knife in his right forearm. (R. 130, Defs.' Resp. to Suppl. Facts ¶ 6.)

It is also not entirely clear from the record which officers were present during the altercation. Officer Romero's testimony suggests that he was present prior to the altercation but not during. (R. 115-5, Ex. E to Mot., Romero Dep. at 13-14.) However, Plaintiff's testimony suggests otherwise. (Conwell Dep. at 59.) Officer Malloy testified that he was on duty at the time and witnessed at least part of the altercation. (R. 115-7, Ex. G to Mot., Malloy Dep. at 8.) Plaintiff testified that Officer Chapman was also present at the time of the altercation. (Conwell Dep. at 72-73.) Plaintiff cites to Sergeant Darnice Wiggins's deposition testimony for the proposition that she "took statements of the officers who were present during the altercation." (Pl.'s Resp. to Facts ¶ 23.) However, it does not appear that any of the parties attached the relevant portion of Sergeant Wiggins's deposition transcript. Documents also suggest that Defendant Bowens was also present at some point: Sergeant Wiggins and Lieutenant Bowens

both signed an Inmate Disciplinary Report documenting that a fight had occurred between Dawson and Plaintiff, but it is not clear from the document whether they were present for the actual altercation. (R. 122-3, Ex. C to Pl.'s Resp., Inmate Disciplinary R.) The same day of the altercation, Plaintiff also submitted a grievance that stated, "Supervisors Sgt. Wiggin and Incompetent Lt. Bowers [sic] fail[ed] to supervise the officers they were suppose to manage. This is the second incident that Involve[d] Lt. Bowers [sic] where I've ended up in the Stroger Trauma Unit with a[n] injury." (R. 124-4, Ex. D to Resp., 10/25/2012 Grievance.) Thus, the record suggests that Lieutenant Bowens, Sergeant Wiggins, and Officers Romero, Malloy, and Chapman were on duty and present immediately before, during, and/or after the altercation.

Officer Malloy contacted medical staff following the altercation and Plaintiff testified that he received medical treatment "between 35 and 45 minutes" later. (Pl.'s Resp. to Facts ¶¶ 20-21.) While the extent of Plaintiff's injury is disputed, he testified that he lost a fair amount of blood because of the stabbing. (Conwell Dep. at 75-76.) However, The Inmate Disciplinary Report lists Plaintiff's injuries as a "small scratch to right arm." (Inmate Disciplinary R. at 1.)

As a result of this altercation, Plaintiff alleges that Officers Romero, Chapman, Malloy, and two John Doe Officers failed to protect him, (Third Am. Compl. ¶¶ 72-83), and that Lieutenant Bowens and Sergeant Wiggins failed to supervise these officers, (id. ¶ 85). Plaintiff also alleges that Lieutenant Bowens, Sergeant Wiggins, and Officers Chapman and Malloy failed to seek immediate medical assistance despite Plaintiff's injuries. (Id. ¶¶ 84-88.)

Plaintiff had another altercation with Dawson on July 22, 2013. (Pl.'s Resp. to Facts ¶ 39.) Plaintiff testified that he was sitting on his bed inside his cell while receiving a nebulizer treatment for his asthma. (Conwell Dep. at 80-81.) He testified that he was sitting "three or four inches" from the "chuckhole" of the cell door. (Id.) Plaintiff explained that the reason why he

was sitting so close to the chuckhole was because during the nebulizer treatment an oxygen tube is put through the chuckhole and he had to put his mouth on the oxygen tube. (*Id.* at 82.) As Plaintiff was taking his nebulizer treatment, he testified that Dawson walked up to his cell door and spit on his face. (*Id.* at 79, 82.) Sergeant Ronald Kolnicki was not present when Dawson spit on Plaintiff, but he responded to the incident. (Pl.'s Resp. to Facts ¶ 42.) Plaintiff testified that Sergeant Kolnicki laughed when he heard about what happened. (Conwell Dep. at 86.) Plaintiff also testified that Officers Carol Begley and Koch (first name unknown) were also on duty that day. (*Id.* at 87.) Plaintiff alleges that Sergeant Kolnicki and Officers Begley and Koch failed to protect Plaintiff and adequately respond to Dawson's attack. (Third Am. Compl. ¶¶ 127-29.)

### C. Inmate Miller

On October 10, 2013, Plaintiff had an altercation with inmate David Miller. (Pl.'s Resp. to. Facts ¶ 44.) Plaintiff testified that he was inside Miller's cell at the time of the attack because the phone inside Plaintiff's cell was not working and Officer Begley told Plaintiff that he could use the telephone in Miller's cell. (*Id.*; *see also* Conwell Dep. at 89-90.) Plaintiff testified that while he had never had any previous problems with Miller, he told Officer Begley that he did not feel comfortable going into Miller's cell because he was a "known racist," had "racist tattoos on his body," and "was rumored to be locked up for killing an African-American." (*Id.* at 92.) Officer Begley responded that "nothing [was] going to happen." (*Id.* at 92-93.) Plaintiff was in Miller's cell for approximately five minutes when Miller began threatening Plaintiff. (*Id.* at 93.) Plaintiff testified that Miller pulled him out of his wheelchair, punched him, scratched and clawed at his face, and kicked him. (*Id.* at 94-95.) Plaintiff began screaming and at least ten officers—including Commander David Hudik and Officers Begley, Bailey (first name unknown), and Cruz (first name unknown)—responded. (*Id.* at 96, 99, 104.) Following the

attack, Plaintiff testified that he screamed "I need medical treatment. I need medical attention. I'm bleeding from my elbow. I need to see a doctor." (*Id.* at 104.) Plaintiff testified that Commander Hudik and Officers Cruz (first name unknown), McGee (first name unknown), and Ortell (first name unknown) all heard his cries, but he claims that it took "about two hours" for him to receive medical attention. (*Id.* at 102.) Based on the attack by Miller, Plaintiff alleges that Officers Begley and Bailey failed to protect Plaintiff. (Third Am. Compl. ¶ 149-50.) Plaintiff also alleges that Officer Cruz delayed in sending for medical treatment. (*Id.* ¶ 155.)

## II. Altercations with Defendant Officers

### A. March 12, 2012, Altercation

In March 2012, Plaintiff was in an altercation with Officers Tiscareno, William Baker, Miguel Olavarria, and Jennifer Jefferson. (Pl.'s Resp. to Facts ¶ 6.) The accounts of the altercation are drastically different. Plaintiff testified that prior to the incident he was told by Officer Jefferson that he was going to be transferred to a new cell and that the new cell was "a cell they put people in they want to punish for filing grievances." (Conwell Dep. at 109, 111.) Plaintiff testified that it was the "worst" cell in the unit because it was not handicap accessible, and had leaking plumbing, no view, and no hot water. (*Id.* at 111-12.) Plaintiff testified that he requested to see a supervisor; however, the Officers did not want to wait for a supervisor. (*Id.* at 110, 114.) The situation quickly escalated and Plaintiff testified that Officers Baker and Olavarria "shoved" him out of his wheelchair and punched him, Officer Tiscareno jumped on his back and began choking him, and Defendant Officer Jefferson kicked him in the face. (*Id.* at 114-115.) Plaintiff testified that he eventually lost consciousness, but woke up "30 feet away being dragged by some handcuffs by Baker and Tiscareno to another cell." (*Id.* at 117.) Plaintiff also testified that Officer Ramonita Perez was the "lookout" and did not intervene. (*Id.* at 118.)

Plaintiff attaches a sworn affidavit from inmate Henry Gibbs. (R. 122-5, Ex. E to Resp., Aff.) The affidavit states that Gibbs "saw the officers remove" Plaintiff from his wheelchair "by force," "saw Officer Tiscareno drag detainee Conwell by the collar," and saw Plaintiff "gasping for air because it appeared that he was being choked while he was being dragged across the floor." (*Id.*) Gibbs also attested that "Officers Jefferson, Perez, Olavarria, Baker, and Tiscareno were all present" during the altercation. (*Id.*)

The Defendant Officers' version of events is in stark contrast. They claim that Plaintiff was told that he had to move cells because he was engaging in an activity "resembling masturbation." (Conwell Dep. at 108-109.) Officer Tiscareno testified that when Plaintiff was informed that he would be moving cells, he refused to go, and that he "picked up a metal leg rest from the wheelchair" and "slammed it in his metal stool . . . and told us that he wasn't moving." (R. 130-1, Ex. A to Reply, Tiscareno Dep. at 12-13.) Officer Tiscareno testified that Officer Baker then "reached for the metal leg rest and removed it from his cell," but that Plaintiff "got up from his chair" and moved toward Tiscareno with his hand in a fist. (*Id.* at 13.) Officer Tiscareno stated that he, Plaintiff, and Officer Baker fell to the ground during the struggle. (*Id.*) While trying to restrain Plaintiff, Officer Tiscareno hit his head and jammed his fingers, but he acknowledged that at no time did Plaintiff ever hit him. (*Id.* at 13, 15.) Officer Tiscareno testified that eventually Plaintiff was handcuffed. (*Id.* at 14.) Officer Baker's testimony is similar to Officer Tiscareno's, but he testified that Plaintiff repeatedly kicked his head. (R. 130-2, Ex. B to Reply, Baker Dep. at 12-14.) Because of the incident, Plaintiff was charged with four counts of aggravated battery to a peace officer under 720 ILL. COMP. STAT. 5/12-3.05(d)(4) and was convicted of one count of aggravated battery relating to Officer Baker. (Pl.'s Resp. to Facts ¶¶ 7-8.) The conviction was affirmed on appeal. *People v. Conwell*, No. 1-14-3818, 2016 WL

4138618 (Ill. App. Ct. Aug. 1, 2016). Based on the March 12, 2012, altercation, Plaintiff alleges

that Officers Baker, Tiscareno, Olavarria, and Jefferson used excessive force against him and

that Officer Perez failed to intervene. (Third Am. Compl. ¶¶ 57-62.)

### B. December 13, 2012, Altercation

In December 2012, Plaintiff was transported to Stroger Hospital for medical treatment.

When it was time for Plaintiff to be transported back to the Jail, he testified that the officers

would not allow him to travel in a wheelchair-accessible van, but instead wanted to transport him

in a squad car. (Conwell Dep. at 120-21.) Plaintiff testified that he told the officers that he was

unable to get in the squad car so an unnamed transportation officer "shoved" Plaintiff out of the

wheelchair, started punching him, and told his coworkers to "[h]elp me get this bitch in the car."

(*Id.* at 122.) Plaintiff testified that Officers William Rooney and Robinson (first name unknown)

were also there and both punched him in the face. (*Id.* at 126-27.) Plaintiff testified that the

attack stopped once he was dragged into the squad car. (*Id.* at 130.) Plaintiff stated that after the

attack and while he was still at Stroger Hospital, he complained to Sergeant Johnson (first name

unknown) and told him that he needed medical attention. (*Id.* at 130, 132.) Despite requesting

medical attention while still at Stroger Hospital, Plaintiff was transported back to Cook County

Jail. (*Id.* at 132.) Plaintiff admits that he saw an unidentified medical professional within an hour

of arriving at Cermak Health Services. (Pl.'s Resp. to Facts ¶ 31.) Plaintiff testified that while he

did see a medical professional, he did not see a physician and was not taken to the Cermak

emergency room. (Conwell Dep. at 136.) Plaintiff claims that he made repeated requests to

Lieutenant Albert Martinez, Sergeant Johnson, and Officers Regina Eppes-Davis, Conley (first

name unknown), and Ervin (first name unknown) for additional medical attention, but he claims

that his requests were ignored. (Conwell Dep. at 136.)

Based on the December 13, 2012, altercation Plaintiff alleges that Officers Rooney, Robinson, and other unnamed correctional officers used excessive force against him, and that Sergeant Johnson failed to intervene. (Third Am. Compl. ¶¶ 107-110.) Plaintiff also alleges that Lieutenant Martinez, Sergeant Johnson, and Officers Conley, Eppes-Davis, and Ervin prevented Plaintiff from obtaining medical care. (*Id.* ¶¶ 115-120.)

## III.    Conditions of Plaintiff's Jail Cell

Plaintiff next complains that his jail cell was unsanitary and not handicap accessible. (*Id.* ¶ 132.) While it is unclear if Plaintiff was in an isolation cell because of his medical condition or due to other reasons, Plaintiff testified that each isolation cell is equipped with its own "shower area, sink, bed, phone, [and] desk." (Conwell Dep. at 144.) However, Plaintiff testified that he was placed in a cell in March 2012 that was "cold, [had] water leaking from the toilets, no working phones, . . . no hot water, no view, and they had rodents running around there like cockroaches and bugs and stuff." (*Id.* at 138.) During the summer months, Plaintiff claims that the cell was excessively cold because the air conditioning was set too high. (*Id.* at 140.) He also testified that the water leaking from the toilet was a hazard because he had to get out of his wheelchair to use the toilet and it was unsafe. (*Id.* at 141.) It is unclear from the record how long Plaintiff was in this particular cell, but his testimony suggests that he was exposed to these conditions for "collectively over a year." (*Id.* at 138-39.)

Plaintiff claims that he filed numerous grievances about the conditions of this cell. (*Id.* at 140, 146.) However, there is only one grievance in the record. The grievance dated March 15, 2012, states:

> On 3-15-2012, I was place[d] in a cell on 3-South, there's NO hot water; NO working phone; there's feces and blood on the wall. I was deliberately placed in this cell by correctional ofc. Jefferson in a effort to harras[] me, with the hopes of me catching a disease.

(R, 115-9, Ex. I to Mot., Inmate Grievance Form.) Plaintiff requested to be tested for "any and all diseases," and to have his cell and walls "power washed." (*Id.*) The Inmate Grievance Response form states that "all cells in Cermak are cleaned by Cermak Health Services" and that "CCDOC staff ha[s] no control over Cermak staff." (*Id.* at 2.) Plaintiff claims that he suffered skin rashes from being exposed to the leaking water, but that he was denied treatment to "see a skin specialist." (Conwell Dep. at 141.) Plaintiff also testified that his asthma was aggravated because of the cockroach infestation. (*Id.* at 144-48.) Plaintiff claims that because there was no hot water he took "two or three showers" over the course of a year. (*Id.* at 147.) Based on these conditions, Plaintiff brings a claim challenging the conditions of his confinement against Commander Hudik and Officers Begley and Koch. (Third Am. Compl. ¶¶ 130-38.)

## IV.    Retaliation Claims

Plaintiff generally alleges that all of the instances of substandard living conditions, excessive force, denial of medical care, and failure to protect him from other inmates were acts of retaliation by the Defendant Officers. Specifically, Plaintiff claims that because of the prior lawsuit and the numerous grievances he has filed, many of the Defendant Officers have retaliated against him. (Third Am. Compl. ¶¶ 40, 130, 139, 141, 151.) As for specific instances of retaliation, Plaintiff alleges that Commander Hudik placed him in segregation around March 2013 because of the grievances that he filed. (*Id.* ¶ 130.) Plaintiff also alleges that on or around May 23, 2013, Officers Begley and Koch removed Plaintiff's shoes from his cell and destroyed them in retaliation for the grievances that he filed. (*Id.* ¶ 139.) It is unclear exactly which of the Officers Plaintiff brings retaliation claims against, but Commander Hudik, Lieutenant Bowens, Sergeant Wiggins, and Officers Begley, Smith, Baker, Tiscareno, Perez, Chapman, Malloy, and Romero have moved for summary judgment on this claim.

During his deposition, Plaintiff was asked to testify regarding his retaliation claim and specify any instances that would support his claim; however, he provided few details. (Conwell Dep. at 148-152.) For example, Plaintiff was asked how he knew that any of the Officers were aware of the 2007 lawsuit or any of the grievances that Plaintiff filed and, thus, that they were retaliating against him because of said events. (*Id.* at 149.) Plaintiff testified that some of the Officers worked in the Cermak section of the Cook County Jail in 2007 and "know me from my past." (*Id.* at 149-50.) He also testified that "a lot of [the officers] started off retaliating from day one when I first got in the County and they passed words. It's called paperwork, paper trail." (*Id.* at 151.) However, he testified that he had no knowledge of any of the Defendant Officers communicating amongst themselves regarding retaliating against him. (*Id.* at 152.)

## V.     Sheriff Dart

Finally, Plaintiff alleges that Sheriff Dart, as a custom, policy or practice, failed to properly screen, train, and supervise Cook County Sheriff employees. (Third Am. Compl. ¶¶ 162-63, 166-67, 174-75, 182-86.) As a result of these practices, Plaintiff alleges that his constitutional rights were violated, he was subject to excessive force by the Defendant Officers, and he was retaliated against for filing grievances and lawsuits (*Id.*)

## PROCEDURAL HISTORY

Because the Court has sufficiently outlined the procedural history in this four-year-old case in prior orders, the Court will only briefly touch upon some recent events. *See Conwell v. Cook Cty.*, 12 C 10062, 2015 WL 4973086, at *1 (N.D. Ill. Aug. 18, 2015); *Conwell v. Cook Cty.*, 12 C 10062, 2014 WL 5293403, at *1 (N.D. Ill. Oct. 14, 2014). In its last memorandum opinion and order, the Court dismissed any substantive claims against Cook County but ordered it to remain in the lawsuit "for purposes of indemnification only." *Conwell*, 2015 WL 4973086,

at *5. As to Defendant Officers' Rule 12(b)(5) motion, while the Court recognized that Plaintiff had not properly served 13 of the Defendant Officers within the required statutory period, the Court denied the motion and granted "Plaintiff a final discretionary extension of 30 days to properly served the Defendant Officers." *Id.* at *8. As discussed below, Plaintiff has yet to serve 10 of these 13 Defendant Officers.

On August 26, 2015, Plaintiff filed his third amended complaint. (Third Am. Compl.) While it is not a model of clarity, Plaintiff appears to allege four failure to protect claims, two excessive force claims, failure to intervene, a condition of confinement claim, two denial of medical care claims, numerous retaliation claims, and a claim under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Defendant Officers now move for partial summary judgment as to Plaintiff's claims. (R. 114, Mot.) Plaintiff filed his response, (R. 123, Resp.), and Defendant Officers replied, (R. 132, Reply). In a separate motion, Sheriff Dart moves for summary judgment on the *Monell* claim and seeks to dismiss the unnamed John Does. (R. 117, Dart Mot.) Plaintiff filed a response, (R. 125, Resp. to Dart Mem.), and Sheriff Dart replied, (R. 131, Dart Reply.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the

13

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (internal quotation marks and citation omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [their] favor." *Id.* (internal quotation marks and citation omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008).

At this juncture, the Court cannot weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011). In other words, "summary judgment cannot be used to resolve swearing contests between litigants." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Instead, the Court's role is simply "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson*, 477 U.S. at 249).

## ANALYSIS

### I.     Failure to Protect Claims

The Defendant Officers argue that they are entitled to summary judgment in their favor as to all of Plaintiff's failure to protect claims because "the record demonstrates that Plaintiff has failed to show any Defendant Officer had sufficient knowledge to impose liability on them." (R. 116, Mem. at 3.) Plaintiff argues that he has established facts regarding Defendants' "multiple failures to protect him from attacks by other detainees." (Resp., at 3.)

Because Plaintiff was a pretrial detainee during the relevant time period, his claim falls under the Due Process Clause of the Fourteenth Amendment.[1] *See Smith v. Sangamon Cty. Sheriff's Dep't*, 715 F.3d 188, 191 (7th Cir. 2013). Both the Eighth and Fourteenth Amendments "impose upon prison officials a duty to protect inmates from violent assaults at the hands of fellow prisoners." *Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008) (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). Indeed, "a prison has a duty to its inmates to protect them against violence by other inmates because imprisoning a person blocks his access to forms of self-protection and police protection that he would have on the outside." *Glade ex rel. Lundskow v. United States*, 692 F.3d 718, 722 (7th Cir. 2012). Jail officials will "incur liability for the breach of that duty when they were aware of a substantial risk of serious injury to an inmate but nevertheless failed to take appropriate steps to protect him from a known danger." *Rice ex rel. Rice v. Correctional Med. Servs.*, 675 F.3d 650, 669 (7th Cir. 2012) (alterations, citation, and internal quotation marks omitted).

"A claim that a prison official was deliberately indifferent to such a risk has both an objective and a subjective component." *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015).

---

[1] The standards governing Eighth and Fourteen Amendment claims are largely equivalent, and "anything that would violate the Eighth Amendment would also violate the Fourteenth Amendment." *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009).

The objective prong requires a plaintiff to show that he was "incarcerated under conditions posing a substantial risk of serious harm." *Estate of Miller ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012). The subjective prong requires Plaintiff to show that the official had "actual, and not merely constructive, knowledge of the risk in order to be held liable." *Gevas*, 798 F.3d at 480. In failure to protect cases, a detainee "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Id.* (citation omitted). Plaintiff can also prove actual knowledge by demonstrating that "a prison official knew of a substantial risk from the very fact that the risk was obvious." *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001). However, "negligence is not enough." *Smith*, 715 F.3d at 191 (citations omitted). Conveying to prison officials "only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Gevas*, 798 F.3d at 480-81. Conversely, "a complaint that identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk." *Id.* at 481.

## A. Altercation with Inmate Brooks on February 6, 2012

Lieutenant Bowens and Officer Smith move for summary judgment as to the claim that they failed to protect Plaintiff during the February 6, 2012, attack by Brooks. (Mem. at 5.) Defendant Officers argue that there is no evidence that they were "aware of the threat of attacks." (*Id.*) Plaintiff argues that Officer Smith and Lieutenant Bowens knew that Plaintiff's safety was at risk because earlier in the month Lieutenant Bowens had called Plaintiff a "snitch" in front of other inmates and, as a result, Plaintiff had requested to be in protective custody. (Resp. at 5-6.)

Even viewing the record in the light most favorable to Plaintiff, the facts do not support an inference that Officer Smith acted with deliberate indifference to a substantial risk of known harm. There is no evidence in the record that Plaintiff expressed any general or specific concerns about his safety to Officer Smith. Plaintiff admits that the attack "shocked" him and that he and Officer Smith had no prior issues or altercations. (R. 122, Pl.'s to Defs.' Facts ¶¶ 3-4.) Actual knowledge cannot be imputed to a prison official if the plaintiff himself was unaware of a specific threat. *Guzman v. Sheahan*, 495 F.3d 852, 857-58 (7th Cir. 2007). In addition, a person who was not personally involved in the alleged wrongdoing cannot be held liable for damages under Section 1983. *Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996). Thus, there is no genuine issue of material fact regarding whether Officer Smith acted with deliberate indifference and he is entitled to summary judgment on this claim.

Next, Lieutenant Bowens asserts that he had absolutely no knowledge of any problems between Plaintiff and Miller. This assertion ignores Plaintiff's testimony that Lieutenant Bowens called Plaintiff a snitch in front of numerous inmates the day before the attack, (Conwell Dep. at 38), and, thus, placed Plaintiff in obvious danger. "Branding an inmate a snitch can expose him to serious harm and may violate the Eighth Amendment." *Merritte v. Kessel*, 561 F. App'x 546, 548 (7th Cir. 2014). Although the record is unclear as to what started Plaintiff's altercation with Miller, Plaintiff provides sufficient testimony to permit an inference that Lieutenant Bowens placed him at risk of substantial harm by calling him a snitch and that Miller's attack *may* have been motivated by this designation. *See, e.g., Reed v. Kirk*, 12-CV-8582, 2016 WL 3476659, *10 (N.D. Ill. June 27, 2016) ("A reasonable jury could therefore infer that Kirk had a duty to protect Plaintiff after labeling him a stool pigeon to his cellmate."). Thus, Lieutenant Bowens's motion

for summary judgment is denied for Plaintiff's failure to protect claim arising from the February 6, 2012, altercation.

### B. Altercation with Inmate Dawson on October 25, 2012

Lieutenant Bowens, Sergeant Wiggins, and Officers Chapman, Malloy, and Romero move for summary judgment on the claim that these officers failed to protect Plaintiff during the attack by Dawson on October 25, 2012. (Mem. at 6.) The Defendant Officers argue that they did not have actual knowledge of a substantial risk posed by Dawson. (*Id.* at 6-7.) Defendants also argue that Lieutenant Bowens and Sergeant Wiggins were not involved in the altercation. (*Id.* at 5.) In response, Plaintiff argues that the Defendant Officers were aware of both the Keep Separate Order and the "several previous threats" made by Dawson. (Resp. at 6.)

Defendant Officers incorrectly assert that Plaintiff has "failed to show that any Defendant Officer had actual knowledge of a substantial risk." (Mem. at 6.) Prior to the altercation, Plaintiff filed at least two grievances regarding Dawson, which specifically said that Dawson was threatening him and had a knife. (Emergency Grievances.) Shortly before the attack, Commander Johnsen issued the Keep Separate Order, which states that the two inmates were to be kept separate. (Keep Separate Order.) While several of the Defendant Officers deny having knowledge of the grievances or the Keep Separate Order, Plaintiff testified that he personally told Officers Romero, Chapman, and Malloy about the Keep Separate Order prior to the altercation. (Conwell Dep. at 52-53, 56, 59-60.)

Taking the facts in the light most favorable to Plaintiff, the record supports the inferences that Dawson was threatening Plaintiff, Plaintiff was afraid that Dawson would stab him, Plaintiff articulated these fears through written grievances, and Plaintiff then verbally communicated the fear to Officers Romero, Chapman, and Malloy. *See, e.g., Johnson v. Collins*, No. 3:05-cv-140-

WDS, 2007 WL 2274674, at *5 (S.D. Ill. Aug. 6, 2007) (whether a substantial risk of harm existed was a factual question for the jury where the defendant officer testified that he did not have any knowledge of a keep separate order, but the plaintiff testified that shortly before the fight occurred he told the defendant officer that the two inmates should be kept separate). There is also nothing in the record that demonstrates that these three officers took any action in response to Plaintiff's articulated fears. In fact, despite being on notice of the risk posed by Dawson, the record suggests that these three officers permitted Dawson to be in close proximity to Plaintiff.[2] Ultimately, viewing the evidence in Plaintiff's favor, disputes exist as to whether Officers Romero, Chapman, and Malloy were aware of an impending and immediate threat to Plaintiff. Thus, summary judgment is denied for these Defendant Officers.

Regarding Lieutenant Bowens and Sergeant Wiggins, Plaintiff alleges that they "were the supervisors on duty during the stabbing, and deliberately tried to cover up the stabbing, falsified documents, and deliberately fail[ed] to supervise the officers they were supposed to manage." (Third Am. Compl. ¶ 85.) As a preliminary matter, there is no *respondeat superior* or vicarious liability under § 1983. *See Monell*, 436 U.S. at 694; *Kinslow v. Pullara*, 538 F.3d 687, 692 (7th Cir. 2008). To the extent that Plaintiff is attempting to impose liability on Lieutenant Bowens and Sergeant Wiggins merely because they were the supervisors on duty, summary judgment in favor of Lieutenant Bowens and Sergeant Wiggins is granted. However,
a failure to supervise *can* give rise to liability under § 1983 "if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it." *Lanigan v. Vill. of E. Hazel Crest*, 110 F.3d 467, 477 (7th Cir. 1997). In other words, "to be liable for the conduct of

---

[2] While Officer Romero's and Plaintiff's version of events differ as to whether Dawson was present when Officer Romero took Plaintiff to the staging area, the Court must accept Plaintiff's testimony. If Plaintiff's version of events is true, Officer Romero knew of the risk that Dawson posed to Plaintiff, yet Officer Romero took Plaintiff to the staging area where Dawson was waiting.

subordinates, a supervisor must be personally involved in that conduct." *Id.* It is not enough for a supervisor to be "merely negligent in failing to detect and prevent subordinates' misconduct . . . . The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chi.*, 856 F.2d 985, 992 (7th Cir. 1988).

The record demonstrates that Lieutenant Bowens and Sergeant Wiggins were on duty at the time of the altercation and had some involvement in the dispute. While it is unclear whether the two individuals were aware of the Keep Separate Order or the tensions between the two inmates, Plaintiff suggests that he personally submitted his grievances to Lieutenant Bowens. [3] (Conwell Dep. at 49-52.) Sergeant Wiggins testified that she was not aware of the Keep Separate Order prior to the altercation; however, a grievance filed by Plaintiff on the same day as the altercation suggests that Sergeant Wiggins may have had knowledge that there were issues between the two inmates. Plaintiff submitted a grievance the day of the altercation asserting that Lieutenant Bowens and Sergeant Wiggins were on duty and "fail[ed] to enforce" the Keep Separate Order. (10/25/2012 Grievance.) The grievance also said that it was "the second incident [with] . . . Bowens where I've ended up in the Stroger Trauma Unit with a[n] injury." (*Id.*) Lieutenant Bowens and Sergeant Wiggins also both signed the Inmate Disciplinary Report on the same day of the altercation. However, it is unclear from the contents of the document the degree

---

[3] The testimony on this issue is confusing. Plaintiff testified that he told "Lieutenant J.K. Bowens" about Dawson threatening him. (Conwell Dep. at 52.) Plaintiff was then asked how "Lieutenant J.K. Bowens" responded to the two grievances filed and Plaintiff testified that he "viewed and signed" the grievances and "his name and signature's on there, and its dated." (*Id.* at 56.) It appears that during this line of questioning, the parties combined two of the Defendant Officers' names: Commander J.K. Johnsen and Lieutenant Nathan Bowens. The supporting documents demonstrate that Plaintiff was referring to Commander J.K. Johnsen during this exchange, but because he repeatedly gave Bowens's name when answering questions, the Court is unsure. The two inmate grievance forms are clearly signed with the name Johnsen. (Emergency Grievances at 1, 2, 3.) In addition, Commander Johnsen—not Bowens—was the author of the Keep Separate Order. (Keep Separate Order.) At this stage, there is a genuine issue of fact regarding whether Bowens had knowledge of the grievances and the Keep Separate Order.

of their knowledge or involvement in the altercation. (Inmate Disciplinary R.) At bottom, these documents and Plaintiff's testimony suggest that these two individuals may have had knowledge of the Keep Separate Order and the problems between the two inmates, that they were on duty at the time of the altercation, and that they had some level of involvement in the events surrounding the altercation. Casting the record in Plaintiff's favor, because there is a genuine issue of material fact as to whether Lieutenant Bowens and Sergeant Wiggins directed, approved, had knowledge of, or condoned their subordinates' conduct on October 25, 2012, thus, summary judgment is denied.

### C. Altercation with Inmate Dawson on July 22, 2013

Sergeant Kolnicki and Officer argue that they are entitled to summary judgment as to Plaintiff's failure to protect claim arising from the July 22, 2013, spitting incident with Dawson.

Sergeant Kolnicki argues that summary judgment is appropriate because he was not present at the time of the altercation. (Mem. at 5.) Plaintiff's response focuses on the fact that Plaintiff "reported" to Sergeant Kolnicki what happened and that he "merely laughed and did nothing further." (Resp. at 7.) Plaintiff makes no attempt to articulate how Sergeant Kolnicki could have prevented or intervened in the spitting incident. While this conduct is certainly unprofessional, it is undisputed that he was not present at the time of the altercation and had no prior knowledge that Plaintiff could be at risk of harm. Thus, he is entitled to summary judgment on Plaintiff's failure to protect claim. *See, e.g., Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (holding that failure-to-intervene claim requires plaintiff to show that an officer was "present" and had a "realistic opportunity to intervene to prevent the harm from occurring").

Defendant Officers also argue that Plaintiff has not demonstrated that Officer Begley had actual knowledge of the risk that Dawson posed to Plaintiff. (Mem. at 6-7.) Plaintiff asserts that

Begley had knowledge of Dawson's prior attack and the Keep Separate Order, (Resp., at 7); however, there is no evidence in the record to support this. Officer Begley was not asked about the spitting altercation during her deposition nor about whether she had knowledge of the Keep Separate Order, or the prior altercation between the two inmates. (R. 122-8, Ex. H to Resp., Begley Dep.) While Plaintiff testified that Officer Begley was on duty at the time Dawson spit on him, he did not testify that he told her anything at all about Dawson prior to the incident. (Conwell Dep. at 87-88.) Even construing the evidence in favor of Plaintiff, the Court cannot conclude that Officer Begley had knowledge of the risk and, thus, he cannot be held liable. *Gevas*, 798 F.3d at 480. As such, the Court grants Officer Begley's motion for summary judgment as to Plaintiff's failure to protect claims stemming from the July 22, 2013, spitting altercation with Dawson. In addition, Sergeant Kolnicki and Officer Begley are also entitled to summary judgment on this claim because being spat on, while no doubt unpleasant, does not rise to the level of a constitutional violation. *See, e.g., Robinson v. Sweeny*, No. 12 C 6609, 2013 WL 6451184, at *5 (N.D. Ill. Dec. 5, 2013) (plaintiff could not demonstrate deliberate indifference "where he was allegedly spat on and verbally harassed" because "[e]nduring such conduct . . . does not give rise to a constitutional claim of deliberate indifference").

### D. Altercation with Inmate Miller on October 10, 2013

Officer Begley also moves for summary judgment on the claim that she failed to protect Plaintiff during the attack by Miller. (Mem. at 5.) Officer Begley argues that she cannot be held liable for the October 10, 2013, altercation because she had no way of knowing that Miller would attack Plaintiff. (*Id.*) Plaintiff responds that Miller was a known "racist and violent inmate" and that Officer Begley ignored Plaintiff's concerns about being in the same cell with him. (Resp. at 7.)

The undisputed evidence demonstrates that Officer Begley did not have actual knowledge and was not aware of the risk that Miller would attack Plaintiff. Plaintiff's testimony demonstrates that the altercation between Plaintiff and Miller was sudden and random. Plaintiff testified that he never had any problems with Miller prior to the altercation. (Conwell Dep. at 89.) Except for the brief moment before the altercation, Plaintiff testified that Miller had never threatened him. (*Id.* at 93.) There is also no record that Plaintiff filed any grievances regarding Miller or that there was a Keep Separate Order for the two inmates. Officer Begley testified that the two individuals had "been friends" and that she "never knew there was any kind of rift between them." (R. 115-6, Ex. F to Mot., Begley Dep. at 10.) Moreover, Officer Begley testified that Plaintiff had a history of going into Miller's cell to use his phone and that "Miller would let him always use his phone." (*Id.* at 11.) Regardless of the truth of these statements, Plaintiff admits that the two individuals never had any issues before the incident and that Miller had never threatened him.

In addition, Plaintiff's testimony that he told Officer Begley that he "didn't feel comfortable being in" Miller's cell because Miller was "rumored to be locked up for killing an African-American, and a known racist," (Conwell Dep. at 92), is simply too speculative to defeat summary judgment. "A claim of being celled with inmates of different races or gang affiliations without more—such as the existence of a threat or history of violence—is too general and uncertain" to support a failure to protect claim. *Wilson v. Ryker*, 451 F. App'x 588, 590 (7th Cir. 2011); *see also Lindell v. Houser*, 442 F.3d 1033, 1035 (7th Cir. 2006) (prison officials were not deliberately indifferent when they placed a white supremacist inmate with a black inmate even though the official knew of black inmate's gang involvement and white inmate's expression of fear when nothing indicated any specific threats towards the white inmate). Simply put, a general

risk of violence, by itself, does not establish knowledge of a substantial risk of harm. *See Shields*, 664 F.3d at 181; *Brown*, 398 F.3d at 911. The facts in the record do not suggest that Plaintiff was almost certain or very likely to suffer harm at the hands of Miller. Even if Plaintiff told Officer Begley that he didn't feel "comfortable" near Miller—which is a far cry from an expression that he feared for his life or his physical safety—"prison guards are not required to believe every profession of fear by an inmate." *Lindell*, 442 F.3d at 1035. Given the absence of evidence describing any specific threats or prior issues between the two inmates, there was no reason for Officer Begley to believe that Plaintiff was at serious risk of harm. Thus, summary judgment is granted in favor of Officer Begley as to the October 10, 2013, altercation with Miller.

## II.    Excessive Force Claim

Next, Defendant Officers Baker, Tiscareno, Olavarria, Jefferson, and Perez argue that Plaintiff's failure to protect and failure to intervene claims relating to the altercation that occurred on March 12, 2012, are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), because these claims would undermine his conviction for battery to a police officer. (Mem. at 7-8.) Plaintiff argues that *Heck* does not bar his action because either: 1) the doctrine does not apply because he is a former inmate and cannot challenge the validity of the sanction imposed by appeal or post-conviction procedure; or 2) his present claims are not necessarily inconsistent with his conviction. (Resp. at 8-9.)

In *Heck*, the U.S. Supreme Court held that:

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28

U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

*Heck*, 512 U.S. at 486-87. "Only a claim that 'necessarily' implies the invalidity of a conviction . . . comes within the scope of *Heck*." *Gilbert v. Cook*, 512 F.3d 899, 902 (7th Cir. 2008). In considering whether *Heck* requires dismissal, the Court "must consider the factual basis of the claim and determine whether it necessarily implies the invalidity of [the plaintiff's] conviction." *Helman v. Duhaime*, 742 F.3d 760, 762 (7th Cir. 2014). Thus, the question is whether a recovery for Plaintiff on his excessive force and failure to intervene claims would imply that his conviction for aggravated battery to a peace officer is invalid.

Plaintiff was charged with four counts of aggravated battery to a peace officer under 720 ILL. COMP. STAT. 5/12-3.05(d)(4). (R. 115-4, Ex. D to Mot., Statement of Conviction at 1; *see also* R. 115-3, Ex. C to Mot., Grand Jury Indictment.) The statute provides that "[a] person commits aggravated battery when, in committing a battery, other than by discharge of a firearm, he or she knows the individual battered to be . . . [a] peace officer . . . performing his or her official duties." 720 ILL. COMP. STAT. 5/12–3.05(d)(4). Plaintiff was found guilty of one of these counts. (Statement of Conviction at 5.)

Plaintiff's third amended complaint is silent as to whether he ever struck any of the Defendant Officers, but he does allege that he was punched, kicked, choked unconscious, and dragged by Tiscareno, Baker, and Jefferson. (Third Am. Compl. ¶¶ 58-62.) Plaintiff testified at his deposition that the attack by these officers was unprovoked. (Conwell Dep. at 114-115.) Portions of Plaintiff's account are disputed by Baker and Tiscareno, and at least a portion of it is contradicted by the state court's findings. When affirming Plaintiff's conviction, the Illinois Appellate Court stated: "The [trial] court made it clear that it had no doubts regarding the sufficiency of the evidence during the hearing on the post-trial motions when it reiterated that it

found defendant guilty because of the kicking motion toward Sergeant Baker's head[.]" *Conwell*, 2016 WL 4138618, at *5.

The Seventh Circuit has repeatedly held that an excessive force claim may coexist with an aggravated battery conviction. The Seventh Circuit in *Gilbert* also held that *Heck* does "not affect litigation about what happens after the crime is completed," including whether the force police used in response to the underlying crime was reasonable. *Id.* at 901. The Court also held that an excessive force claimant who was convicted of having struck the first blow is not required to confess in open court to throwing the punch and can proceed with an "argument along the lines of 'The [officers] violated my rights by injuring me, whether or not I struck first.' " *Gilbert*, 512 F.3d at 902; *see also Evans v. Poskon,* 603 F.3d 362, 364 (7th Cir. 2010) (holding that an excessive force claim does not necessarily imply the invalidity of a resisting arrest conviction).

Plaintiff's claims do not *necessarily* imply that his conviction for battery is invalid. The fact that at some point in the altercation, Plaintiff kicked Baker does not necessarily preclude the possibility that after that kick, Plaintiff was choked unconscious, handcuffed, and then dragged to another cell. "Whether a fact-finder would find this scenario plausible is not for us to conclude, but in terms of *Heck*, it is not one that necessarily implies the validity of the conviction, and does not bar" Plaintiff's claim. *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 764 (7th Cir. 2008) (internal quotation marks omitted). It is entirely permissible for Plaintiff to proceed on a theory of "The [officers] violated my rights by injuring me, whether or not I struck first." *Gilbert*, 512 F.3d at 902. Thus, because Plaintiff's excessive force and failure to intervene claims do not necessarily invalidate Plaintiff's prior conviction, these claims are not barred by *Heck*.

While the Court concludes *Heck* does not bar Plaintiff's claims in their entirety, Plaintiff's argument that *Heck* does not apply at all because he is no longer an inmate at the Jail and cannot challenge the validity of a sanction by either appeal or post-conviction procedure is not persuasive. (Resp. at 9.) While it is true that *Heck* may not apply where habeas relief is unavailable to the Plaintiff, *see Burd v. Sessler*, 702 F.3d 429, 435 (7th Cir. 2012), the record demonstrates that habeas relief is likely available to Plaintiff. Plaintiff has been released from confinement, but the records submitted to the Court demonstrate that he was also sentenced to three years of mandatory supervised release.[4] (Statement of Conviction.) Plaintiff may be able to seek habeas relief during his time on supervised release because "mandatory supervised release often entails sufficient restraints on liberty to meet the 'in custody' requirement of habeas corpus." *Burd*, 702 F.3d at 435; *see also* 28 U.S.C. § 2254(a) (providing that habeas corpus is available only to persons who are "*in custody* in violation of the Constitution or laws or treaties of the United States" (emphasis added)). In addition, even if Plaintiff chooses not to pursue habeas relief when he has the opportunity to do so, this does not free him from the constraints of *Heck*. *Burd*, 702 F.3d at 436 ("*Heck* applies where a § 1983 plaintiff *could* have sought collateral relief at an earlier time but declined the opportunity and waited until collateral relief became unavailable before suing."). Thus, Plaintiff's argument must be rejected.

The fact that *Heck* does not bar all of Plaintiff's claims does not end the inquiry. Consistent with the Seventh Circuit's directive in *Gilbert*, when this case proceeds to trial, Plaintiff will not be permitted to introduce evidence contrary to the state court's factual findings that he battered Officer Baker. *Gilbert*, 512 F.3d at 902; *see also Viramontes v. City of Chi.*, ---

---

[4] The Illinois Department of Corrections website indicates that Plaintiff was released from custody on August 21, 2015, and that his supervised release is set to end on August 21, 2018. *Offender Search*, ILL. DEP'T OF CORR., https://www.illinois.gov/IDOC/OFFENDER/Pages/InmateSearch.aspx (last visited on November 2, 2016).

F.3d ---, 2016 WL 6135854, at *2-4 (7th Cir. Oct. 21, 2016) (explaining the content, timing, and usage of a *Gilbert* instruction). As the Court in *Gilbert* emphasized, if Plaintiff attempts to contest his conviction, these statements "must be ignored" and will be remedied through a jury instruction. *Gilbert*, 512 F.3d at 902. The parties will be given an opportunity to submit proposed jury instructions (and objections thereto) prior to trial. Because *Heck* doesn't bar these claims, Defendant Officers Baker, Tiscareno, Olavarria, Jefferson, and Perez's motion for summary judgment as to Plaintiff's excessive force and failure to intervene claims is denied.

## III. Denial of Medical Care

Defendant Officers Chapman, Malloy, Wiggins, and Bowens move for summary judgment on the claim that they were deliberately indifferent to Plaintiff's medical needs after the October 25, 2012, attack by Dawson. (Mem. at 15.) In addition, Defendant Officers Martinez and Eppes-Davis move for summary judgment on the claim that they denied him medical care after he was allegedly attacked by other correctional officers at Stroger Hospital on December 13, 2012. (*Id.* at 16.)

"The Due Process Clause of the Fourteenth Amendment prohibits deliberate indifference to the serious medical needs of pretrial detainees." *Pittman ex rel. Hamilton v. Cnty. of Madison*, 746 F.3d 766, 775 (7th Cir. 2014) (internal quotation marks and citation omitted). Deliberate indifference to a serious medical need has both an objective and a subjective element: the inmate must have an objectively serious medical condition, and the defendant must be subjectively aware of and consciously disregard the inmate's medical need. *Farmer*, 511 U.S. at 837; *Roe v. Elyea*, 631 F.3d 843, 862 (7th Cir. 2011). A serious medical condition is one "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a layperson would perceive the need for a doctor's attention." *Edwards v. Snyder*, 478 F.3d 827, 830-831

(7th Cir. 2007) (citation omitted). "This subjective standard requires more than negligence and it approaches intentional wrongdoing," comparable to criminal recklessness. *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). While "[d]elay is not a factor that is either always, or never, significant . . . the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Id.*

### A. October 25, 2012, Altercation

Defendant Officers Chapman and Malloy argue that Plaintiff cannot demonstrate the subjective component of his deliberate indifference claim because it is undisputed that "Defendant Malloy contacted medical staff and that Plaintiff was provided with medical treatment." (Mem. at 15.) Wiggins and Bowens argue that they are entitled to summary judgment because they "were not involved in the October incident." (*Id.*) Defendant Officers also argue that Plaintiff's deliberate indifference claim fails because "there is no evidence that he was harmed as a result of the [35-45 minute] delay" in seeing a medical professional. (*Id.*) Plaintiff counters that there is "direct and circumstantial evidence that the Defendants were deliberately indifferent to his condition" and "the officers on [the] scene refused to take [Plaintiff] for medical treatment for 45 minutes, even though the incident occurred right outside of the jail's medical facility." (Resp. at 14-15.)

Plaintiff has not presented evidence demonstrating that the Defendant Officers were deliberately indifferent to his medical needs. Plaintiff testified that Dawson hit him "with a wheelchair arm" and stabbed him with a knife in his right forearm. (Conwell Dep. at 66, 70.) The parties dispute the severity of Plaintiff's injury and the time it took for Plaintiff to receive

medical attention. For the purposes of this motion, the Court accepts Plaintiff's version of events. Plaintiff testified that he lost a fair amount of blood and that it was "pooled all over the floor"; however, he admits that he did not need a blood transfusion. (Pl.'s Resp. to Facts ¶ 19-22; Conwell Dep. at 75-76.) Plaintiff admits that he saw a medical professional "between 35 and 45 minutes" after the altercation ended. (Pl.'s Resp. to Facts ¶ 21.) Plaintiff did not submit evidence regarding the specific treatment he received following the altercation (*i.e.*, stitches, bandages, pain medication), but Officer Malloy testified that the medical staff covered the wound by putting gauze on it. (Malloy Dep. at 12.) Plaintiff did not testify that he suffered increased pain or that his condition worsened in the intervening 35-45 minutes while waiting to see a medical professional. He also did not submit any medical evidence demonstrating that his injuries were exacerbated from the delay.

It is undisputed that the altercation occurred in close proximity to the emergency room at Cermak Health Services and that the Defendant Officers secured medical treatment for Plaintiff less than one hour after the altercation. Plaintiff suggests that the Defendant Officers should have treated the situation in a more urgent manner and that 35-45 minutes was an unreasonable delay. However, Plaintiff has cited no case law that would suggest that this delay for this type of injury was an unreasonable amount of time. *See, e.g., Warren v. Scott*, No. 14-3020, 2016 WL 183502, at *2-3 (C.D. Ill. Jan. 14, 2016) (one-hour delay in transporting the plaintiff who was suffering from appendicitis to a medical unit and subsequent 20-minute delay to complete paperwork was not "an unreasonable amount of time"); *Jacobo v. Will Cty. Sheriff's Office*, No. 09 C 3392, 2011 WL 4553030, at *9 (N.D. Ill. Sept. 29, 2011) (concluding that "[n]o reasonable jury could conclude that [the nurse] acted with the recklessness needed to prove a deliberate indifference claim" when the nurse conducted an initial medical evaluation but there was a 45-minute delay

between the assault and the nurse calling a physician for assistance). Ultimately, Plaintiff has not shown how the delay he experienced worsened his condition or resulted in additional infliction of pain. Therefore, the Court concludes that there is no genuine issue of material fact as to whether the Defendant Officers were deliberately indifferent to Plaintiff's October 25, 2012, medical needs and, thus, grants Defendant Officers Wiggins, Bowens, Chapman, and Malloy's motion for summary judgment on this claim.

### B. December 13, 2012, Altercation

Defendant Officers Martinez and Eppes-Davis move for summary judgment regarding Plaintiff's claim that they failed to obtain medical care for him following the altercation he had with officers in the Stroger Hospital parking garage. Defendant Officers Martinez and Eppes-Davis argue that Plaintiff has not met the objective prong of his claim because he has failed to demonstrate that his alleged injuries constitute a serious medical need. (Mem. at 16.) Plaintiff does not specifically address the December altercation, but argues generally that he "exhibited objectively serious medical needs on more than one occasion while incarcerated." (Resp. at 15.)

Plaintiff claims that because of the altercation he "suffer[ed] a bloody nose, cuts as well as other injuries," (Pl.'s Suppl. Facts ¶ 16); however, there is nothing in the record that establishes the extent of his injuries. While Plaintiff admits that he received medical attention within one hour of arriving at the Jail, (Pl.'s Resp. to Facts ¶ 31), there is no indication that Plaintiff broke any bones, received stitches, or suffered any lasting harm whatsoever. Even assuming that Plaintiff suffered a bloody nose and other injuries associated with being punched in the face, courts have repeatedly held that injuries resulting from fighting do not rise to the level of a serious medical need. Bruising and swelling are not objectively serious. *Elcock v. Whitecotton*, 434 F. App'x 541, 543 (7th Cir. 2011) (nurse's assessment that scratches and

31

bruises did not require further medical attention did not support claim for deliberate indifference;

*Pinkson v. Madry*, 440 F.3d 879, 891 (7th Cir. (finding that inmate with swollen cheek and split

lip from altercation did not have objectively serious medical need); *Scruggs v. Miller*, No. 3:16-

CV-050 JD, 2016 WL 495603, at *2 (N.D. Ind. Feb. 8, 2016) ("Because the allegations show

Scruggs suffered from nothing more than a simple bloody nose, there can be no constitutional

claim for deliberate indifference of a serious medical need."). Because Plaintiff's injuries

sustained during the December 13, 2012, altercation did not constitute an objectively serious

medical condition, Defendant Officers Martinez and Eppes-Davis cannot be held liable for

deliberate indifference, even if they failed to provide or seek medical attention for those injuries

as Plaintiff claims.[5]

## VI.    Conditions of Confinement Claim

Commander Hudik and Officer Begley move for summary judgment on Plaintiff's

conditions of confinement claim because the conditions complained of were not unconstitutional

and there is no evidence demonstrating that the Defendant Officers "were deliberately indifferent

to his jail cell conditions." (Mem. at 10-13.) Plaintiff argues that he has satisfied the objective

prong because he was placed in a cell that was "not handicap accessible, lacked hot water, and

was kept at an excessively cold temperature." (Resp. at 12.) Plaintiff also argues that he has

satisfied the subjective prong by demonstrating that "Commander Hudik, Officer Koch, and

Officer Begley were all personally aware of said conditions but failed to remedy them despite

Plaintiff's complaints." (*Id.*)

The Due Process Clause prohibits the state from punishing a pretrial detainee and

requires jail officials to provide humane conditions of confinement for detainees. *Townsend v.*

---

[5] The Defendant Officers also argue that they are entitled to qualified immunity for this claim. (Mem. at
19-20). The Court need not address the qualified immunity issue because it concludes that the Defendant
Officers are entitled to summary judgment on these claims.

*Fuchs,* 522 F.3d 765, 773 (7th Cir. 2008). The government's obligation includes providing

adequate food, clothing, shelter, protection, and medical care. *Id.* This requires the prison to

provide protection from the cold. *See Gillis v. Litscher,* 468 F.3d 488, 493 (7th Cir. 2006). To

establish a conditions of confinement claim, Plaintiff must present evidence that (1) he suffered a

sufficiently serious constitutional deprivation, and (2) Defendants acted with deliberate

indifference to the conditions of his confinement. *Sain v. Wood,* 512 F.3d 886, 894 (7th Cir.

2008).

### A. Whether Conditions Were Sufficiently Serious

The Defendant Officers argue that Plaintiff has not established that the conditions of his

confinement amount to a constitutional violation. (Mem. at 13-14; Reply at 9-10.) In response,

Plaintiff argues that even if one of the conditions complained of does not satisfy the applicable

standard, the combination of all of the conditions that he describes satisfies the objective prong

of the test. (Resp. at 10-11.)[6]

To establish the objective prong, the challenged condition must amount to an "extreme

deprivation," *Hudson v. McMillan,* 503 U.S. 1, 9 (1992), and must "pose[ ] an unreasonable risk

of serious damage to [the inmate's] future health," *Helling v. McKinney,* 509 U.S. 25, 35 (1993).

---

[6] The Defendant Officers also argue that Plaintiff has "failed to show he suffered a physical injury as
required by the" Prisoner Litigation Reform Act ("PLRA"). (Mem. at 9-10.) Defendants are correct that
an inmate generally cannot recover compensatory damages without physical injury. The Prisoner
Litigation Reform Act ("PLRA") states that "no Federal Civil action may be brought by a prisoner
confined in a jail, prison, or other correctional facility for mental or emotional injury suffered while in
custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). However, Plaintiff claims that
he did suffer physical injuries. In addition, even if Plaintiff did not suffer a physical injury, he may still be
eligible for nominal or punitive damages. *See Thomas v. Illinois,* 697 F.3d 612, 614-15 (7th Cir. 2012)
(explaining that nominal and punitive damages are available due to "hazard, or probabilistic harm" even
in absence of physical or psychological harm); *Calhoun v. DeTella,* 319 F.3d 936, 942 (7th Cir. 2003)
("[W]e have approved the award of nominal [and punitive] damages for Eighth Amendment violations
when prisoners could not establish actual compensable harm."). Because Plaintiff claims physical injuries
and even if he didn't he could still seek to recover nominal or punitive damages, Section 1997e is not fatal
to his claim.

However, to implicate the Eighth and Fourteenth Amendments, the deprivation must create a serious risk to an inmate's health or safety, *see Farmer*, 511 U.S. at 835, which may be shown by conditions that create a sufficiently high probability of harm. *Thomas v. Illinois*, 697 F.3d 612, 615 (7th Cir. 2012). Even when an individual condition of confinement is not serious enough to violate the Constitution, conditions may cumulatively do so "when they have 'a mutually enforcing effect that produces the deprivation of a single, identifiable human need.' " *Budd v. Motley*, 711 F.3d 840, 842-43 (7th Cir. 2013) (quoting *Wilson v. Seiter,* 501 U.S. 294, 304 (1991)). In addition, "[c]ivil detainees are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013) (internal quotation marks and citation omitted).

The Seventh Circuit's recent opinion in *Gray v. Hardy*, 826 F.3d 1000 (7th Cir. 2016), is instructive. In *Gray*, the Seventh Circuit reversed the trial court's determination that none of the conditions that the plaintiff complained of were sufficiently serious to violate the Eighth Amendment. *Id.* at 1003. The inmate complained of unsanitary cells, an infestation of vermin, the constant presence of bird feces, broken windows and other holes in the walls, receiving one clean towel every eight months, and a lack of access to cleaning supplies. *Id.* at 1004. The Court explained that the defendant's approach to the plaintiff's claims was to "pick apart the individual components of [the] claim and to suggest, that each one, alone, is not intolerable." *Id.* at 1005. Indeed, the Seventh Circuit noted that the plaintiff's complaints of cockroaches and lack of access to adequate cleaning supplies "on their own" were insufficient. *Id.* at 1005. However, it was necessary to take a "holistic view of the conditions." *Id.* at 1006. Thus, the Seventh Circuit concluded that "[r]eading the record in the light most favorable to Gray, we are satisfied that he has shown enough to avoid summary judgment on his claim that the myriad infestations and his

lack of access to adequate cleaning supplies, *taken together*, deprived him of the basic human need of rudimentary sanitation in violation of the Eighth Amendment." *Id.* at 1005 (emphasis added).

Plaintiff's deposition testimony and grievance record demonstrates that he complains of the following conditions in his jail cell: lack of hot water, cold temperatures including excessive air conditioning in the summer months, walls that had blood and feces on them, leaking water, and a cockroach and pest infestation. (Pl.'s Resp. to Facts ¶ 54; Inmate Grievance Form; Conwell Dep. at 138-148.) Similar to the defendant in *Gray*, the Defendant Officers' response is to attempt to pick apart the individual components of Plaintiff's claim. The Defendant Officers' reply states that the allegedly cold conditions were not extreme enough and that rodents and insects are simply present at the Jail. (Reply at 9-10.) In addition, while Defendants repeatedly deny Plaintiff's testimony regarding the condition of his jail cell, Defendants submit little to no evidence that refutes Plaintiff's complaints.[7] Ultimately, the Defendant Officers fail to take a "holistic view of the conditions." *Gray*, 826 F.3d at 1006.

Admittedly, some of the individual deprivations about which Plaintiff complains (*i.e.*, no view and no working telephone inside his jail cell) most certainly do not rise to the level of a constitutional violation. However, the totality of other conditions that Plaintiff describes—lack of hot water, cold temperatures, no accommodation for his disability, presence of a cockroach infestation, blood and feces on the cell walls—are sufficiently serious that a jury could find that he is entitled to relief under Section 1983. *See, e.g.*, *Gray*, 826 F.3d 1000; *Lyons v. Vergara*, No. 14 CV 9564, 2016 WL 4493455, at *4-5, *6-7 (N.D. Ill. Aug. 26, 2016) (totality of conditions—

---

[7] Defendant Hudik testified that facilities management "never received a complaint" about a lack of hot water and that he "never received any complaints from Plaintiff" on this issue, (Hudik Dep. at 9); however, one of the grievances that Plaintiff has submitted explicitly states "NO hot water; no working phone; . . . feces and blood on the wall," (Inmate Grievance Form).

which included having sheets that were dirty and in poor condition, not having a bath towel, having a "filthy" cell, pest infestation, water that was yellow and tasted strange—were sufficiently serious so as to deny summary judgment). As such, a triable issue of fact exists as to whether the conditions Plaintiff experienced were unconstitutional.

### B. Whether Commander Hudik and Officer Begley Were Deliberately Indifferent

Next, Plaintiff must also demonstrate that "he suffered some cognizable harm from the overall lack of sanitary environment," and that the Defendant Officers' "deliberate indifference caused that harm." *Gray*, 826 F.3d at 1006. When assessing this prong, the Court must "look for physical injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Gray*, 826 F.3d at 1006 (citation and internal quotation marks omitted).

The Defendant Officers argue that Plaintiff did not suffer any injury as a result of the jail's conditions. (Mem. at 13-14; Reply at 8, 9-10.) However, Plaintiff testified that he developed skin rashes as a result of the leaking water and that his asthma was exacerbated because of the cockroach infestation. (Conwell Dep. at 141, 147-48.) Plaintiff testified that he suffers from asthma and Defendants do not appear to dispute this fact. "Asthma, if serious enough, can constitute injury for Eighth Amendment purposes." *Gray*, 826 F.3d at 1006. Plaintiff also testified that there was a cockroach infestation in his jail cell and because of this infestation he was in and out of the hospital for his asthma. (Conwell Dep. at 147.) This testimony suggests a causal link between the unconstitutional conditions alleged and Plaintiff's injury. *See Gray*, 826 F.3d at 1007 ("Gray left no doubt that he was alleging that his worsened asthma symptoms . . . resulted from increased dust and dander. He presented evidence of the infestations and his

worsened health, and he suggested that the timing indicated a causal link."); *see also Thompson*, 697 F.3d at 615 ("we note that cockroaches can transmit bacteria that aggravate asthma and cause other disease"). Thus, at this stage in the litigation, Plaintiff has sufficiently demonstrated that he has suffered some cognizable harm from the overall lack of a sanitary environment.[8]

But, Plaintiff's claim falters at the last hurdle—to demonstrate a triable issue of fact regarding whether Commander Hudik and Officer Begley were deliberately indifferent to the living conditions within Plaintiff's cell. To be held liable, Defendants Hudik and Begley must have "known of and disregarded an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Plaintiff's response repeatedly insists that summary judgment must be denied because he filed "several grievances" and Commander Hudik and Officer Begley were "personally aware of said conditions." (Resp. at 12.) However, the record demonstrates that Commander Hudik or Officer Begley had no knowledge of the conditions inside Plaintiff's cell. Defendant Hudik testified that did not remember receiving complaints from Plaintiff, whether Plaintiff's cell was handicap accessible, whether there was leaking plumbing in his cell, or that Plaintiff suffers from asthma. (R. 115-8, Ex. H of Mot., Hudik Dep. at 5-9.) Likewise, there is nothing in Officer Begley's deposition that demonstrates that she had any knowledge regarding the conditions of Plaintiff's cell. Indeed, she was not asked about the conditions of Plaintiff's cell. (*See generally* R. 115-6, Ex. F to Mot., Begley Dep.) Plaintiff repeatedly testified that he submitted numerous

---

[8] Plaintiff has not provided medical records or an expert report supporting his physical injury assertions; however, the Seventh Circuit has recently held that this does not necessarily doom his claim. In *Gray*, the court determined that the fact that the plaintiff did not rely upon an expert report or medical records to support his allegations of physical injury did not warrant summary judgment in favor of the defendant because the plaintiff was seeking damages for injuries already suffered and not alleging damages for future injury. *Gray*, 826 F.3d at 1007. The Court also concluded that the plaintiff was relying on the "common-sense link between excessive dust, insect dander, and the like, and compromised breathing" to support his claim that his asthma was exacerbated and he developed skin rashes as a result of the allegedly unconstitutional conditions. *Id.* Thus, similar to *Gray*, the fact that Plaintiff has not submitted a supporting expert report is not case dispositive.

grievances regarding the conditions of his cell but did not testify that he verbally complained of the conditions of his cell to Commander Hudik or Officer Begley, or any other officer. (Conwell Dep. at 138-148.) The single grievance regarding the conditions of Plaintiff's cell that has been submitted to the Court does not contain a signature or written response by Commander Hudik or Officer Begley and there is absolutely no evidence that they ever received a copy of the grievance or had knowledge of it. (Inmate Grievance Form.) Ultimately, there is no genuine issue of material fact regarding whether Commander Hudik or Officer Begley were deliberately indifferent to the living conditions within Plaintiff's cell. As such, Commander Hudik and Officer Begley's motion for summary judgment as to Plaintiff's conditions of confinement claim is granted.[9]

## IV. First Amendment Retaliation Claim

Commander Hudik, Lieutenant Bowens, Sergeant Wiggins and Officers Begley, Smith, Baker, Tiscareno, Perez, Chapman, Malloy, and Romero next move for summary judgment on the multitude of claims alleging that they retaliated against Plaintiff. (Mem. at 17-19.) The Defendant Officers argue that they are entitled to summary judgment because Plaintiff has failed to present evidence that their actions "were in retaliation for activity protected by the First Amendment," and Plaintiff "has failed to present any evidence of a causal link" between Plaintiff's actions and the Defendant Officers' alleged retaliation. (*Id.*)

At the summary judgment stage, the plaintiff has the initial burden to make out a prima *facie* case of retaliation by showing that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First

---

[9] Because the Defendant Officers are entitled to summary judgment on Plaintiff's conditions of confinement claim, the Court will not address their argument that they are entitled to qualified immunity for this claim, (Mem. at 20.)

Amendment activity was at least a motivating factor in the decision to impose the deprivation."

*Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014). If the plaintiff makes this prima

facie showing, the defendant must show that the adverse action would have occurred anyway.

*Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013). If the defendant meets this burden, then

the plaintiff must show that defendant's proffered reason is pretextual—in other words, a lie.

*Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012). The filing of prison grievances and

lawsuits are protected First Amendment activity. *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir.

2015); *Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. 2005). Thus, Plaintiff satisfies the first prong

of a retaliation claim because the filing of a lawsuit in 2007 and subsequent grievances regarding

the conditions of the jail were protected First Amendment activity.[10] The Defendant Officers'

motion largely focuses on the third prong of a prima facie retaliation claim—whether the First

Amendment activity was at least a motivating factor in the decision to impose a deprivation.

---

[10] The Defendant Officers argue that "detainees do not have a constitutional liberty interest in a grievance procedure, and the inability to have grievances investigated does not give rise to a § 1983 claim." (Mem. at 18.) The Seventh Circuit has held that the alleged mishandling of grievances "by persons who otherwise did not cause or participate in the underlying conduct states no claim." *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996) (grievance procedures do not give rise to a protected liberty interest). However, a prisoner may have a due process claim if the allegations include the obstruction of a grievance about an underlying constitutional violation. *See Perez v. Fenoglio*, 792 F.3d 768, 781-82 (7th Cir. 2015) (finding that prison officials who received detailed correspondence about an underlying constitutional violation may be personally liable for failing to act upon receipt of those grievances). The Defendant Officers are correct that Plaintiff's general allegations regarding the grievance process—such as his allegation that "CCDOC supervisors; directors; I.A.D.; and O.P.R. have all failed to intervene" in the investigation of Plaintiff's grievances, (Third Am. Compl. ¶ 141)—cannot give rise to a cognizable Section 1983 claim. However, most of Plaintiff's grievance allegations are directed at Commander Hudik and involve an underlying alleged constitutional violation. For example, as part of Plaintiff's allegations that the Defendant Officers attacked him and then denied him adequate medical care on December 13, 2012, he alleges that Commander Hudik "deliberately failed to investigate [Plaintiff's] grievances," that he "failed to send [Plaintiff's] grievances to" the Office of Professional Review, and that he was a "deliberately unfair and impartial decision maker covering up for External Operations Correctional Officer[s]" (*Id.* ¶¶ 123-25.) The Defendant Officers have not moved for summary judgment as to this excessive force claim. Plaintiff's allegations and supporting evidence regarding Commander Hudik's role in the grievance process following this altercation may have bearing on his knowledge of the December 13, 2012, altercation. Thus, these allegations and any supporting evidence may be relevant to Plaintiff's underlying constitutional violation claim.

In support of his claims of retaliation, Plaintiff makes a series of allegations regarding the fact that Dawson threatened Plaintiff, that Plaintiff believed that Officer Tiscareno was assisting Dawson in harming Plaintiff, and that the Officers largely ignored Plaintiff's reports and failed to intervene when violence ensued. (Third Am. Compl., ¶¶ 69-88.) Plaintiff may meet his burden of demonstrating that the First Amendment activity was at least a motivating factor in the decision to impose a deprivation by showing a "chronology of events from which retaliation could be inferred." *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009). The chronology of events as it pertains to Plaintiff's altercation with Dawson allows the Court to infer that retaliation may have occurred.

Here, Plaintiff filed grievances on August 30, 2012, and August 31, 2012, complaining that Dawson was threatening him and that Officer Tiscareno was facilitating the threats. (Emergency Grievance.) Indeed, the second grievance accused Officer Tiscareno of giving Dawson a knife. (*Id.*) Plaintiff also signed an "Office of Professional Review Complaint Register" on September 19, 2012, reiterating the same allegations. (*Id.*) A few weeks later, Commander Johnsen issued the Keep Separate Order. (Keep Separate Order.) On October 25, 2012, Plaintiff testified that he was placed by some of the Defendant Officers in close proximity to Dawson despite the fact that he explicitly told the officers about the Keep Separate Order and his fear of Dawson. Dawson proceeded to attack Plaintiff. Immediately following the altercation, Plaintiff submitted another grievance regarding Lieutenant Bowens and Sergeant Wiggins claiming that they knew of the Keep Separate Order but did nothing to prevent the attack.

The Defendant Officers argue that the only support for Plaintiff's retaliation claim is that "2007 was followed by February 2012, which was followed by March 2012, and that one can 'infer' later events were retaliation for earlier events." (Reply at 11.) However, this does not

place these series of events in the proper light. All of the events relating to Dawson and the fight occurred over a span of less than eight weeks. A reasonable jury viewing the evidence in Plaintiff's favor could conclude that Lieutenant Bowens, Sergeant Wiggins, and Officers Chapman, Malloy, Romero, and Tiscareno placed Plaintiff near Dawson in retaliation for the grievances he filed regarding Tiscareno and/or Dawson. Thus, Plaintiff demonstrates a genuine issue of material fact on the third element of a motivating factor that Lieutenant Bowens, Sergeant Wiggins, and Officers Chapman, Malloy, Romero, and Tiscareno retaliated against Plaintiff for filing grievances.

Plaintiff also claims that he was placed in an unsanitary and handicap inaccessible cell and was the subject of excessive force in retaliation for filing grievances. Specifically, Plaintiff alleges that on March 12, 2012, Officer Jefferson announced that he would have to move cells. (Third Am. Compl. ¶ 54.) Plaintiff testified that Officer Jefferson told him that he was being moved to "a cell they put people in they want to punish for filing grievances," (Conwell Dep. at 111), and that Officers Baker, Tiscareno, and Perez were present when she conveyed this sentiment, (id. at 111-19; Third Am. Compl. ¶ 57). When Plaintiff refused to move cells, Plaintiff alleges that Officers Jefferson, Tiscareno, and Baker attacked him and that Officer Perez acted as the lookout. (Third Am. Compl. ¶¶ 58-64.) Ultimately, there is a genuine issue of fact as to whether Officers Baker, Tiscareno, and Perez moved Plaintiff from his cell and subjected him to excessive force because of the prior grievances that he had filed. Thus, Officers Baker, Tiscareno, and Perez's motion for summary as to Plaintiff's retaliation claim is denied.

However, Plaintiff has failed to establish the second and third prong of a retaliation claim against Commander Hudik. Plaintiff alleges that Commander Hudik placed Plaintiff in segregation in retaliation for Plaintiff writing grievances about Commander Hudik and his

correctional staff. (Third Am. Compl., ¶ 130.) Plaintiff did not testify regarding this topic and there is no document demonstrating that Commander Hudik ordered Plaintiff into segregation in March 2013. Commander Hudik testified that Plaintiff was housed in a single cell while in custody, but that this was "ordered by medical" and was "[d]ue to medical reasons." (Hudik Dep. at 7-8.) There is no evidence that Plaintiff suffered a deprivation at the hands of Hudik that was likely to deter his protected First Amendment activity.

Additionally, Plaintiff provided no testimony that demonstrates that Commander Hudik had knowledge of Plaintiff's grievances, and Commander Hudik testified that he had no specific knowledge of Plaintiff's grievances. Commander Hudik testified that if an inmate had a grievance, the grievance is submitted to a social worker, but he did not testify that he reviews grievances as a matter of course. (Hudik Dep. at 10.) Notably, all of the grievances that Plaintiff submitted in opposition to this motion are from at least five months prior to Commander Hudik's alleged retaliation. Even considering the evidence in the light most favorable to Plaintiff, there is no genuine issue of material fact regarding whether Commander Hudik knew of Plaintiff's grievances and ordered Plaintiff into segregation in March 2013 because of these complaints. Thus, Commander Hudik is entitled to summary judgment on Plaintiff's retaliation claim.

Next, Plaintiff alleges that on or around May 23, 2013, Officer Begley removed and destroyed Plaintiff's shoes in retaliation for the grievances that he filed. (Third Am. Compl. ¶ 139.) Even assuming that Plaintiff makes a prima facie showing of retaliation, Begley argues that it is undisputed that Cook County Jail "has a policy that street shoes cannot be worn unless the detainee has a prescription for them," and "Plaintiff did not have a prescription for street shoes." (Pl.'s Resp. to Facts ¶¶ 37-38.) Plaintiff admits these facts and does not cite to any evidence in the record that would demonstrate that the Defendant Officers' reasoning for removing the shoes

is false. (*Id.*) Thus, regardless of whether Officer Begley knew of Plaintiff's prior grievances and removed his shoes from his cell in retaliation for filing grievances, the unauthorized street shoes would have been removed from his cell anyway. *See, e.g., Webber v. Hussain*, No. 14 CV 5987, 2016 WL 2958370, at *4 (N.D. Ill. May 23, 2016) (granting summary judgment in favor of defendants and concluding that "even if [the defendants] did know of her opposition to medication, whether any retaliatory animus or personal hostility played a part in their actions is irrelevant, because they would have administered the injection anyway"). Summary judgment for Plaintiff's First Amendment retaliation claim relating to the removal of his shoes from his cell against Officer Begley is granted.

Finally, Plaintiff has produced no evidence to support a retaliation claim against Officer Smith. The parties did not submit Officer Smith's deposition testimony and Plaintiff provided no testimony regarding the alleged retaliation committed by him. Thus, Plaintiff has not carried his burden at this stage and there is no evidence to demonstrate that Officer Smith knew of any prior complaints and retaliated against Plaintiff because of those prior filings. Officer Smith is entitled to summary judgment as to Plaintiff's retaliation claim.

## V.  *Monell* **Claim**

Sheriff Dart argues that he is entitled to summary judgment on the *Monell* claim because Plaintiff has adduced no evidence—aside from his own say-so—that any of the alleged unconstitutional customs or widespread practices even exists. (R. 119, Dart Mem. at 8-9.) Plaintiff responds that the "deposition testimonies together with the evidence in this case, establish that, as a result of" Sheriff Dart's failure to "supervise, train, or discipline [CCJ prison officials] . . . unofficial custom and practices occurring at the CCJ caused Plaintiff . . . to endure violations of his Constitutional rights." (Resp. to Dart Mem. at 1.)

Under *Monell*, municipal entities cannot be held liable simply because they employ individuals who engage in wrongdoing. *See Monell*, 436 U.S. at 691. Instead, for liability to attach, a plaintiff must demonstrate that the municipality *itself* caused or participated in the deprivation of his or her constitutional rights. *Id.* at 694; *see also League of Women Voters of Chi. v. City of Chi.*, 757 F.3d 722, 727 (7th Cir. 2014) (observing that a *Monell* claim is viable only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" (quoting *Monell*, 436 U.S. at 694)). There are three means of establishing liability under *Monell*. A municipality may be held liable "if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009).

Plaintiff admits that he is not claiming that an official policy existed but instead argues that widespread practices and customs exist. (R. 125, Reply at 3.) There is no "bright-line" rule defining what constitutes a "widespread custom or practice," but at a minimum, it requires more than one instance of misconduct, or even more than two or three instances. *Thomas*, 604 F.3d at 303. This requirement is meant to ensure "that there is a policy at issue rather than a random event." *Id.* In addition, for a municipality to be held liable for an unlawful custom or practice, the plaintiff must show that municipal policymakers "were deliberately indifferent as to the known or obvious consequences" of that custom or practice. *Id.* (citation and internal alteration omitted). In other words, municipal officials "must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id.* A plaintiff

must also demonstrate causation—specifically, that the official policy, action, or custom was the "moving force" behind the violation of his constitutional rights. *Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (citation omitted).

A generous reading of Plaintiff's complaint identifies two alleged widespread practices in support of his *Monell* claim and his response to Sheriff Dart's motion fleshes out a third. First, Plaintiff alleges that Sheriff Dart has a widespread practice of failing to properly screen, train, and supervise Cook County Sheriff's employees, and as result Plaintiff was subjected to excessive force by the Defendant Officers. (Third Am. Compl., ¶ 186.) Second, he claims that Sheriff Dart failed to properly screen, train, and supervise Cook County Sheriff's employees so as to prevent incidents of retribution for an inmate's use of the grievance process or other First Amendment activity. (*Id.* ¶¶ 174-76.) Third, he claims that Sheriff Dart has a widespread practice of failing to supervise and "implement sufficient training to prison officials specifically toward inmates in protective custody." (Resp. to Dart Mem. at 5.) In support of his argument that he has come forward with evidence to support these claims, Plaintiff relies upon three things: 1) a 2008 Department of Justice Report outlining the conditions of the Cook County Jail; 2) the subsequent Agreed Order which was entered in *U.S. v. Cook County*, No. 10 C 2946 (N.D. Ill., filed on May 13, 2010); and 3) his own allegations contained in his complaint and deposition testimony. (Resp. to Dart Mem. at 4-5, 6-9; *see also* R. 124-9, Ex. I to Resp. to Dart Mem., 2008 Report; R. 124-10, Ex. J to Resp. to Dart Mem., Agreed Order.) The Court will address each source—individually and collectively—to determine whether Plaintiff has sufficient evidence to support his allegations of an unconstitutional widespread practice or custom.

Plaintiff suggests that the existence of the 2008 Report demonstrates a widespread practice of failing to supervise and "implement sufficient training to prisoner officials

specifically toward inmates in protective custody." (Resp. to Dart Mem. at 5, 13.) Plaintiff points out that the 2008 Report states that the "[g]enerally accepted correctional practices require that officers who are assigned to [protective custody units] . . . possess a high level of detention experience, received focused training in special management operations, and are regularly assigned to these units for stability purposes." (R. 124, Pl.'s Suppl. Facts to Dart Mot., ¶ 31.) The Report also states that "[c]orrectional officers in CCJ's special management units rotate on a regular basis and do not receive specialized training for working with high risk inmates. This practice should be changed at the policy level." (R. 124-9, Ex. I to Resp. to Dart Mem., Justice Report at 37.)

While Sheriff Dart argues that the 2008 Report is not admissible, (Dart Mem. at 11), the Seventh Circuit recently addressed this issue in *Daniel v. Cook Cty.*, 833 F.3d 728 (7th Cir. 2016). In *Daniel*, the Seventh Circuit reversed the district court's grant of summary judgment to defendants, holding that the evidence raised a genuine issue of material fact as to whether his injury resulted from systemic, gross deficiencies in the Jail's medical care. *Id.* at 735. To support his claim, the plaintiff relied upon an array of evidence including his own testimony and experience, a medical opinion, contradictory testimony from Jail officials, the 2008 Justice Report, and the Agreed Order. *Id.* at 732-33. As in this case, the defendants in *Daniel* objected to the 2008 Department of Justice report and the district court concluded that it was inadmissible because it "lacked sufficient indicia of trustworthiness." *Id.* at 739. However, the Seventh Circuit concluded that the Report met the standards for admissibility under Rule of Evidence 803(A)(iii) as a "hearsay exception in civil cases for 'factual findings from a legally authorized investigation.' " *Id.* at 740 (quoting Rule 803). The court held that, at a minimum, the report is admissible to show that the defendants were on notice of specific deficiencies. *Id.* at 740-42.

Thus, this Court will consider the 2008 Justice Report when assessing Plaintiff's *Monell* claim. *See also Martinez v. Cook Cty.*, No. 11 C 1794, 2012 WL 6186601, at *4 n.7 (N.D. Ill. Dec. 12, 2012) ("[C]ourts have found Department of Justice letters of this exact type, when relevant, admissible under Federal Rule of Evidence 803(8)[.]").

While the Justice Report may be admissible, it does not, standing alone, demonstrate that there currently exists a widespread practice and custom of Sheriff Dart failing to train and supervise jail officials assigned to protective custody units. The Department of Justice's investigation into the Cook County Jails occurred in 2007, and Plaintiff's allegations focus on his incarceration at the jail during 2012 and 2013. The conditions identified in 2007 do not necessarily demonstrate the conditions of the Jail in 2012 and 2013. *See, e.g., Holland v. City of Gary*, 2013 WL 124061, at *5 (N.D. Ind. Jan. 8, 2013), *aff'd*, 533 F. App'x 661 (7th Cir. 2013) (Justice Department report "inspection occurred long before the events in the Complaint and therefore are not evidence of the state of the Jail in 2010"). In addition, unlike the plaintiff in *Daniel*, Plaintiff does not demonstrate that the deficiencies relating to the staffing of protective custody units identified in the 2008 Report continue to exist. Plaintiff has not tied the 2008 Report regarding protective custody staffing and training to any other evidence. He did not depose Sheriff Dart or any other officials and ask them any questions regarding the staffing, training, and organization of the protective custody units.[11] Ultimately, the reliance on one paragraph in the 2008 Report does not create a genuine issue of material fact as to whether a widespread practice or custom existed that Sheriff Dart failed to implement sufficient training for

---

[11] If Plaintiff is relying upon other provisions in the 2008 Report to support his *Monell* claim, he does not specifically identify those provisions and it is not this Court's job to "sift through the record and make the case for a party." *Hunt ex rel. Chiovari v. Dart*, 754 F. Supp. 2d 962, 980 (N.D. Ill. 2010); *see also DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record.").

prisoner officials who worked in protective custody units. *See, e.g., Hunt*, 754 F. Supp. 2d at 980 (granting summary judgment in favor of the Cook County Jail and concluding that the reliance on a portion of the 2008 Report did not demonstrate that "the Sheriff condoned a policy of inadequate detainee protection").

Plaintiff's response also cites to various provisions in the Agreed Order addressing the proper procedures for the inmate grievance system, emergency medical care, and the maintenance of the jail and its facilities. (Resp. to Dart Mem. at 7-9; Agreed Order ¶¶ 34, 38, 40, 46, 83.) Aside from quoting the Agreed Order verbatim, Plaintiff provides a single sentence explaining the import of these provisions. Plaintiff asserts: "Despite the procedures and Agreed Order allegedly in place, Mr. Conwell has sufficiently alleged that on numerous separate occasions, guards intentionally used excessive force, failed to follow protection orders directly affecting Mr. Conwell's safety, and failed to provide him or seek to provide him with medical attention in a timely manner." (Resp. to Dart Mem. at 9.) This sentence suggests that Plaintiff is not even using the Agreed Order to support his *Monell* claim, but is actually using the Agreed Order to support his individual claims against the officers. However, even if the Court were to conclude that Plaintiff is attempting to rely upon the provisions of the Agreed Order to demonstrate a widespread practice or custom, it is of little assistance to Plaintiff.

The court in *Daniel* also addressed the Agreed Order. In *Daniel*, the trial court declined to take judicial notice of the Agreed Order. On appeal the plaintiff argued that exclusion was in error. *Daniel*, 833 F.3d at 742. The Seventh Circuit affirmed the trial court's determination and explained:

> The facts from the Agreed Order are in dispute for purposes of this case. Defendants in the 2010 litigation made clear that they did not "waive the right to contest the July 11, 2008 findings letter or any of the conclusions set forth therein." The facts in the Order were consented to "For the purposes of this

lawsuit only." Finally, the Order makes clear that the Agreed Order itself would not be "admissible against Defendants except in a proceeding involving the parties to this Agreed Order." The district court did not err by declining to take judicial notice of facts asserted in the Agreed Order.

*Id.* at 743. Similar to the holding in *Daniel*, the Court will not take judicial notice of the facts in the Agreed Order and will not rely upon the Agreed Order to find that Plaintiff has demonstrated an unconstitutional widespread practice or custom. *See, e.g., Holland*, 2013 WL 124061, at *5 (concluding that settlement agreement between Department of Justice and Lake County Jail was inadmissible because "the agreement with the Department of Justice specifically indicates that it is not an admission of any failure of the Lake County Jail to comply with the provisions therein").

What is ultimately left to demonstrate a widespread practice and custom of any sort is Plaintiff's own experience at the Cook County Jail. Plaintiff repeats the facts surrounding his grievances about Dawson, the existence of the Keep Separate Order, and the subsequent altercation with Dawson, and all of the other incidents that he included in his third amended complaint. (Resp. to Dart Mem. at 10-13.) Plaintiff concludes that "[b]ut for Defendant Dart's deliberate indifference as to the Defendant Officers being improperly trained, supervised, and being ignorant to the CCJ's 'keep separate policy,' Mr. Conwell would have been kept separate at all times from inmate Dawson." (*Id.* at 5.) In addition, he states that the facts in his complaint and deposition testimony demonstrate that has "created a genuine issue of material fact as to whether [Sheriff Dart] . . . failed to supervise" and train "officials specifically towards inmates in protective custody, including Mr. Conwell." (*Id.* at 5, 13.) He also concludes that these facts demonstrate that Plaintiff suffered retaliation because of Sheriff Dart failing to "properly discipline said officials." (*Id.* at 5, 13.)

"To prove an official policy, custom, or practice within the meaning of *Monell*, [the plaintiff] must show more than the deficiencies specific to his own experience, of course." *Daniel*, 833 F.3d at 734. Indeed, "a plaintiff cannot ultimately prove a *Monell* claim at trial based on only his own case or even a handful of others. He must show systemic failings that reflect official deliberate indifference to the serious health needs of inmates." *Id.* at 742; *see also Palmer v. Marion Cnty.*, 327 F.3d 588, 596 (7th Cir. 2003) ("When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice[.]"). The vast majority of Plaintiff's response to Sheriff Dart's motion for summary judgment is a repeat of the facts alleged in his complaint. (Resp. to Dart Mem. at 9-15.) That is not sufficient at this stage. *Sterk*, 770 F.3d at 627. The Court has already concluded that the Defendant Officers are entitled to summary judgment on the majority of these claims. At most, Plaintiff's allegations show a couple of isolated acts of misconduct and not a widespread practice or custom. *See Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (noting that two, three, or four incidents of improper conduct are not sufficient to support allegations of a widespread practice). In addition, Plaintiff has not identified even one other inmate who suffered similar alleged constitutional violations, let alone enough similarly situated inmates to demonstrate a policy. Plaintiff's personal experiences by themselves do not demonstrate "that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Phelan,* 463 F.3d at 790. Finally, because Plaintiff has not overcome this threshold element of his *Monell* claim—the existence of a policy—his claim must fail. Thus, Sheriff Dart's motion for summary judgment is granted.

## VI.    John Doe Defendants

The third amended complaint names four John Doe Officer Defendants. (Third Am. Compl.) Sheriff Dart argues that summary judgment should be granted as to these John Doe

Officers, or in the alternative, the claims should be dismissed. (R. 119, Dart Mem. at 13.)

Plaintiff does not respond to this argument. When including an unnamed officer in his complaint, Plaintiff has the burden "of taking the steps necessary to identify the officer[s] responsible for his injuries." *Strauss v. City of Chicago*, 760 F.2d 765, 770 n.6 (7th Cir. 1985). While this lawsuit was originally filed four years ago and the parties have engaged in extensive discovery, Plaintiff's counsel has not sought to amend his complaint to identify these John Doe Officer Defendants. Because the John Doe Defendant Officers have not been served with summons, this Court lacks jurisdiction over them. *Strauss*, 760 F.2d at 770 ("John Doe was never served with summons and a copy of the complaint, so that the district court lacked jurisdiction over him. In this situation, dismissal of both parties was proper."). As such, the John Doe Officer Defendants are dismissed from this lawsuit. *Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007) (noting that discovery is a plaintiff's opportunity to identify unknown and unnamed defendants and that the failure to do so before discovery closed warranted dismissal of unknown and unnamed defendants from the case).

## VII.     Officer Defendants Not Served

Finally, there are ten Defendant Officers who were never served with a summons and a copy of the third amended complaint. (*See* R. 100, Min. Entry; *see generally* Docket.) Rule 4(m) states: "If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." FED. R. CIV. P. 4(m).[12] Pursuant to Rule 4(m), the Court dismisses Plaintiff's claims against Defendant Officers Bailey (first name unknown), Conley (first name unknown), Cruz (first name unknown), Ervin

---

[12] Prior to the December 2015 Amendments to the Federal Rules of Civil Procedure, a plaintiff was given 120 days to serve the summons and complaint under Rule 4(m). However, the 90-day and 120-day time limits have no bearing on the instant issue because Plaintiff *never* served the summons and complaint.

(first name unknown), Koch (first name unknown), J.K. Johnsen, Johnson (first name unknown), McGee (first name unknown), Ortell (first name unknown), and Toney (first name unknown).

## CONCLUSION

For the reasons stated above, the Court GRANTS in part and DENIES in part the Defendant Officers' motion for summary judgment. (R.114.) Specifically, Officer Smith's motion for summary judgment is GRANTED and Lieutenant Bowens's motion for summary judgment is DENIED as to Plaintiff's failure to protect claim arising out of the February 6, 2012, altercation. Lieutenant Bowens, Sergeant Wiggins, and Officers Romero, Chapman, and Malloy's motion for summary judgment is DENIED as to Plaintiff's failure to protect claim arising out of the October 25, 2012, altercation. Sergeant Kolnicki and Officer Begley's motion for summary judgment is GRANTED as to Plaintiff's failure to protect claim arising from the July 22, 2013, altercation. Officer Begley's motion for summary judgment is GRANTED as to Plaintiff's failure to protect claim arising from the October 10, 2013, altercation. Officers Baker, Tiscareno, Olavarria, Jefferson, and Perez's motion for summary judgment is DENIED as to Plaintiff's failure to protect and failure to intervene claims relating to the March 12, 2012, altercation. Lieutenant Bowens, Sergeant Wiggins, and Officers Chapman and Malloy's motion for summary judgment is GRANTED as to Plaintiff's failure to provide medical care claim resulting from the October 25, 2012, altercation. Lieutenant Martinez and Officer Eppes-Davis's motion for summary judgment is GRANTED as to Plaintiff's failure to provide medical care claim resulting from the December 13, 2012, altercation. Commander Hudik and Officer Begley's motion for summary judgment is GRANTED as to Plaintiff's conditions of confinement claim. Lieutenant Bowens, Sergeant Wiggins, and Officers Chapman, Malloy, Romero, Tiscareno, Baker, and Perez's motion for summary judgment is DENIED as to

Plaintiff's retaliation claims. However, Commander Hudik and Officers Begley and Smith's motion for summary judgment is GRANTED as to Plaintiff's retaliation claim.

The Court also GRANTS Sheriff Dart's motion for summary judgment. (R. 117.) Specifically, Sheriff Dart's motion for summary is GRANTED as to Plaintiff's *Monell* claim. In addition, the Court dismisses without prejudice all of the unnamed John Doe Defendant Officers and any Defendant Officers who were not properly served with a summons and a copy of the complaint. This dismissal includes Defendant Officers Bailey (first name unknown), Conley (first name unknown), Cruz (first name unknown), Ervin (first name unknown), Koch (first name unknown), J.K. Johnsen, Johnson (first name unknown), McGee (first name unknown), Ortell (first name unknown), and Toney (first name unknown).

In fairness to the parties and because the nature and scope of this lawsuit has substantially changed, the trial date set for November 14, 2016, is reluctantly stricken. The parties shall appear for a status hearing on November 15, at 9:45 a.m., and shall be prepared to set a firm trial date for the remaining issues in this delayed lawsuit. The parties are DIRECTED to reevaluate their settlement positions in light of this opinion and to exhaust all settlement possibilities prior to the status hearing.

ENTERED: _____

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: November 9, 2016**